## 57864. SUBER v. FOUNTAIN.

QUILLIAN, Presiding Judge.

Plaintiff appeals from a jury verdict for defendant in an action for malicious prosecution, and also judgment for the defendant on his counterclaim for damages to his personal property and punitive damages.

This is a continuing dispute which arose from a land line disagreement and has resulted in two prior appellate cases — *Fountain v. Suber,* 225 Ga. 361 (169 SE2d 162) (1969) and *Fountain v. Bryan,* 229 Ga. 120 (189 SE2d 400) (1972). Thereafter, defendant Fountain filed an action in 1973 against plaintiff Suber to enjoin the plaintiff from interfering with the defendant marking off the boundaries of a road which went through defendant's property to the plaintiff's property. The line between the two adjoining property owners had been thought to be settled in a processioning proceeding and marked by the

county surveyor in 1968. Defendant alleged the surveyor's stakes had been removed and when the defendant attempted to erect a fence — 6 inches inside his property line, plaintiff pulled up a fence post, threw it further back onto defendant's property and stopped the fence contractor from continuing to erect a fence, stating: "it's not the property line . . . I'll kill any-damned-body that tries to put up a fence here." Defendant Fountain asked a deputy sheriff to come to that location. Mr. Suber could not be located. The deputy is said to have advised the defendant to "see the Justice of the Peace and swear out a warrant." Defendant admitted he signed the warrant and came to the hearing but was never permitted to call any witnesses.

The justice of the peace testified that he dismissed the warrant when advised by the district attorney "to dismiss the case because it is a civil matter and not a criminal [matter.]" No formal hearing was held but the justice of the peace talked to the plaintiff and the defendant and then dismissed the case.

Plaintiff then brought this action for malicious prosecution. Defendant denied the prosecution was maliciously carried on and was without probable cause. Defendant alleged that plaintiff's action "is but a continuation of harrassment, damages and threats done to the lives and property of the defendant and his son commenced in 1968, and continued down to date." Defendant entered a counterclaim in the amount of $1,253 for fence damages — alleged to have been caused by plaintiff, and additional damages of $75,000 to deter plaintiff "from repeating his trespasses."

The jury returned a verdict against the plaintiff on his action for malicious prosecution, and for the defendant in the amount of $1,253 fence damage and $40,000 "punitive damages." The plaintiff brings this appeal. *Held:*

1. We will address enumerations of error 1, 2 and 4 together, as they allege the court erred in entering judgment for defendant, in failing to direct a verdict for the plaintiff on the counterclaim, and in failing to grant a new trial, as "there was no evidence to support the judgment . . . and no evidence to support the jury verdict."

The voluminous record — 942 pages, defies summarization of all the facts. We have reviewed the record and find the verdict was authorized by the evidence. *Howard v. Fleming,* 231 Ga. 364 (201 SE2d 422); *Smith v. Smith,* 235 Ga. 109, 114 (218 SE2d 843). The evidence presented questions for the jury which were resolved in favor of the defendant. *Powers v. Powers,* 228 Ga. 598 (187 SE2d 291). The evidence did not demand a verdict for the plaintiff and the jury was authorized by the evidence to reach a finding for the defendant. *Rutland v. Taylor,* 232 Ga. 893, 895 (209 SE2d 218). The jury verdict has the approval of the trial judge, and after verdict the evidence is to be construed in the light most favorable to the prevailing party and every presumption and inference is in favor of sustaining the verdict. *Boatright v. Rich's,* 121 Ga. App. 121 (1) (173 SE2d 232). And, if there is any evidence to sustain the verdict of the jury, an appellate court will not disturb it. *Worn v. Sea-Cold Services,* 135 Ga. App. 256 (2) (217 SE2d 425). These enumerations are without merit.

2. The third and fifth enumerations contend there was no evidence to support a finding that the plaintiff "willfully, wantonly or intentionally caused" the damages alleged by the defendant, therefore there was no basis "or evidence" to support an award of punitive damages — which were "so excessive that it justified the inference of gross mistake or undue bias."

a. Fred and Sammy Thaxton testified that plaintiff interrupted their attempt to install a fence 6 inches inside the property line on defendant's land. After the plaintiff stopped them, they rechecked the plat that they had obtained and "the next day they came back and somebody had pulled them up." Fred Thaxton stated that he was 15 to 20 feet south of the driveway to plaintiff's house when plaintiff stopped him and "pulled the fence up." He advised plaintiff that he was operating from a plat obtained from Mr. Futral's office which carried the notation "this was a court order signed by Judge Bell." Thaxton stated that plaintiff replied: "I don't give a damn who signed it. I'll kill any-damned-body that tries to put a fence up here." Thaxton said plaintiff then stated: "I'm going to take my bulldozer and push down the rest of it

because it's in the way of my airplane." Thaxton appeared at the courthouse to testify about these matters but was not called as a witness.

Later when he attempted to finish the fence the plaintiff drove up in his automobile and told him he was not going to "connect up the fence." When he advised plaintiff that he was going to connect up the fence, plaintiff returned to his automobile and Thaxton heard a sound "like an automatic shotgun when you throw a shell in the chamber." Two of his employees ran away but Thaxton continued. Plaintiff went into the house, "a window pane burst out and the barrel of a gun came out that window pane." He continued to work until he finished the fence.

Deputy Sheriff Wilder testified that he was present when the fence was completed. Plaintiff exhibited a shotgun and stated "he'd shoot anybody that got on his land, including me . . . he went in the old house . . . poked the gun through the window and knocked out a couple of windows." There was no shooting.

b. In the fall of 1974, after the defendant had used his harrow to plow his field adjacent to the road, he later returned to find a dual-wheeled vehicle had packed down the plowed field. He saw the plaintiff's dual-wheeled truck parked on his property. He discussed this with plaintiff and was advised that he would not be able to farm that particular piece of property. Defendant testified that plaintiff told him: "I'll die and go to hell before I see that road moved over one foot." Defendant stated that the plaintiff drove his vehicles about "fifty feet" from the roadway over his plowed fields. "It's only when he drove up and down just making the road wider and wider and packing my field on out is what I complained about . . . Taking possession . . . deliberately." Although the roadway was only 16 feet, defendant allowed plaintiff 20 feet but this did not stop plaintiff from going outside the right-of-way. Defendant saw the plaintiff go outside the right-of-way and asked him to go with him to stake out the road. Defendant testified: ". . . he threatened my life with three types of guns that he carried continuously . . . A shotgun, a high powered rifle and a pistol . . . He said he would settle it with guns . . . The next day [he saw] Mr.

Suber [tear] them [the stakes] down . . ."

c. On December 14, 1975, just after the criminal trespass warrant had been sworn out, defendant returned from church to find the fence adjacent to the road "was torn up." "Staples had been pulled out, wire had been cut, the fence had been pulled away from the post." Defendant testified as he started to repair the fence the plaintiff drove up: "He was incoherent. He was muttering . . . profanity . . . [His] face was red. The muscles on the back of his neck were knotted up and he kept getting madder and madder . . . [He said] I'm going to run y'all out of the county one way or the other." After repairs had been completed because their truck was headed in the direction of the plaintiff's house they proceeded down the public road to "turn around." As they "turned around . . . Gunfire started pouring out . . ." They could not determine where the shots came from but reported the matter to the sheriff.

d. A neighbor, Mr. Posey, surveyed the damage done to defendant's fence. He described in detail where the wire was broken or cut, with a sharp instrument, posts dislocated, and some posts were splintered. The damage "was all on Mr. Suber's side." In his opinion, a "piece of farm equipment did it . . . a heavy piece of equipment." Photographs were introduced to show the damage done. Mr. Futral, a surveyor, testified the fence was located on the land of the defendant within a line he surveyed.

e. Defendant testified that plaintiff owns an airplane and used it "to disrupt my cattle and stampede them . . . To run them through fences . . . He has buzzed the house . . . he would buzz the [grain] bins" when they were unloading.

"[T]o authorize the imposition of exemplary damages, or punitive damages as they are commonly called, under Code Ann. § 105-2002, there must be evidence of wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences." *General Refractories Co. v. Rogers,* 240 Ga. 228, 230 (239 SE2d 795). "Our cases on punitive damages do not present clear guidelines to follow, and it would be simple to say that punitive liability in every case is a jury question. But in examining the cases approving

punitive damages awards, we find there has been one or more clear acts supporting wilful or wanton conduct, malice, oppression, conduct exemplifying conscious indifference to consequences or a succession of tortious acts. See *Guest v. Riddle,* 237 Ga. 535 (288 SE2d 910) (1976) (wilful misconduct in entering property); *Pratt Engineering &c. Co. v. Trotti,* 142 Ga. 401 (83 SE 107) (1914) (intentionally causing unnecessary inconvenience); *Darnell v. Columbus Show-Case Co.,* 129 Ga. 62 (58 SE 631) (1907) (a distinct physical invasion of property; a positive tort)." *General Refractories Co. v. Rogers,* 240 Ga. 233-234, supra.

Here there were acts and words of the plaintiff, on more than one occasion, that would have authorized the jury to find wilful misconduct, malice, wantonness, oppression, want of care, and a succession of tortious acts, which would establish aggravating circumstances under Code Ann. § 105-2002. *Guest v. Riddle,* 237 Ga. 535, 537, supra; *General Refractories Co. v. Rogers,* 240 Ga. 230, supra.

Plaintiff also contends the punitive damages are so excessive as to indicate "gross mistake or undue bias." We do not agree. The Supreme Court has stated: "The evidence of wilful, deliberate, wrongful and unlawful picketing of plaintiff's business causing great injury and damage to his property, was sufficient to authorize the jury to award punitive damages, Code § 105-2002; and this court cannot say that the amount awarded [$50,000] was excessive, as punitive damages are fixed by the enlightened conscience of an impartial jury, and the jury's verdict will not be disturbed by this court as the amount awarded would not justify an inference of 'gross mistake or undue bias.' " *National Association &c. v. Overstreet,* 221 Ga. 16 (4b) (142 SE2d 816). "[I]f the law . . . authorizes a recovery and there is evidence to support the verdict, and nothing in the record shows that it resulted from gross mistake, undue bias or prejudice, or from other corrupt motives, this court is not authorized to set it aside upon the ground that it is excessive." *Jones v. Spindel,* 128 Ga. App. 88, 95 (196 SE2d 22). The amount of damages being peculiarly for the jury, appellate courts are reluctant to substitute their

judgment for that of the triers of fact. See Code Ann. § 105-2015 (Code § 105-2015). "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear 'exorbitant,' 'flagrantly outrageous,' and 'extravagant.' 'It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush.' It must carry its death warrant upon its face." *Realty Bond &c. Co. v. Harley,* 19 Ga. App. 186, 187 (91 SE 254). Given the cumulative facts the jurors were authorized to find the threats, use of deadly weapons, airplanes, and farm equipment for destruction of personalty, invasion of property, and the extended number of years of such harrassment — we cannot say as a matter of law that such amount was not justified by the facts or necessary to prevent recurrence. No error of law appears which would require reversal. *Jones v. Spindel,* 128 Ga. App. 88, 94-95, supra; *West Ga. Pulpwood &c. Co. v. Stephens,* 128 Ga. App. 864 (4) (198 SE2d 420); *Melton v. Bow,* 145 Ga. App. 272 (4) (243 SE2d 590); affd. 241 Ga. 629.

3. The sixth enumeration of error alleges "the jury awarded punitive damages both as a civil fine and as a deterrent to prevent a repetition of the alleged wrongful act." The court charged the jury on damages under Code Ann. § 105-2002, that if "you find aggravating cir-cumstances, the jury may award additional damages to deter the wrongdoer . . ." The jury returned a verdict for defendant on his counterclaim and claim for punitive damages in the following words: "$1,253 for fence repair $40,000 civil fine for punitive damages." The court polled the jury, asking: "The award in favor of Mr. Fountain for special damages plus $40,000 punitive damages?" Each juror stated that this was his or her verdict. While the jury remained in the box, the written verdict was amended to reflect "additional damages (punitive damages) in favor of J. D. Fountain and against W. E. Suber in the amount of $40,000." Counsel for the plaintiff stated he had no objection "to the form of the verdict." Neither was there any objection entered to the procedure used to amend the verdict. Finally, the jury was questioned by the court:

"Any member of the jury who understands the verdict on the punitive damages to be different from that as read, please stand. (No response from jurors) . . ."

Plaintiff cites *Johnson v. Morris,* 158 Ga. 403, 405 (123 SE 707), which held, inter alia: "The jury cannot assess damages for the double purpose of punishment and prevention." We find *Johnson,* supra, inapposite. In *Johnson* the court *charged* the jury "they may give to the plaintiff such damages as their enlightened consciences may dictate, to punish the defendant *and* deter him from similar acts in the future." (Emphasis supplied.) The court's holding was that they could give one or the other but not both. *Johnson,* of course, was the progenitor of *Westview Cemetery v. Blanchard,* 234 Ga. 540, 544 (216 SE2d 776), which held: "Although [Code Ann. § 105-2002] does not speak of 'punitive damages,' the additional damages allowed are what would commonly be called 'punitive' " and such damages "are allowable either to deter the wrongdoer or to compensate for wounded feelings, but not both."

In the instant case, the court instructed the jury only on special damages to the property of the defendant and "additional damages" for "aggravating circumstances" under Code Ann. § 105-2002 "to deter the wrongdoer." Such "punitive" damages were found except that the jury attached the label: "$40,000 civil fine for punitive damages." Does this phraseology vitiate the verdict and require the construction contended by the plaintiff — that it is "punishment and prevention." We find that it does not.

"Verdicts shall have a reasonable intendment, and shall receive reasonable construction, and shall not be avoided unless from necessity." Code Ann. § 110-105 (Code § 110-105). "Presumptions favor the validity of verdicts and a construction, if possible, will be given which will uphold them. If ambiguous and susceptible of two constructions, that construction which would uphold the verdict is to be applied." *Adams v. Smith,* 129 Ga. App. 850, 853 (5) (201 SE2d 639); accord, *Haughton v. Judsen,* 116 Ga. App. 308, 310 (157 SE2d 297); *West Ga. Pulpwood &c. Co. v. Stephens,* 128 Ga. App. 864, 870, supra. Accordingly, the verdict arrives with the presumption of

validity, should not be voided unless necessary, and if any ambiguity exists should be so construed — if possible — to uphold the verdict. See *Powell v. Moore,* 202 Ga. 62, 66 (42 SE2d 110).

Other aids in constructions of verdicts are applicable. "On the return of a verdict, the court may direct the jury to strike from it anything that is mere surplusage." *Tift v. Towns,* 63 Ga. 237 (5). The canon "utile per inutile non vitiatur" (surplusage does not spoil the remaining part if that is good in itself — Black's Law Dictionary) is relevant for the verdict complained of was "$40,000 civil fine for punitive damages." The jury did not award a "civil fine" *and* "punitive damages." They awarded a "civil fine for punitive damages." Thus, the words "civil fine" are surplusage as they were used to describe "punitive damages" which the jury was authorized to award if they found "aggravating circumstances." With the surplusage omitted the verdict is not subject to the objection made. *Monk-Sloan Co. v. Quitman Oil Co.,* 10 Ga. App. 390 (73 SE 522); *Patterson v. Fountain,* 188 Ga. 473, 475 (4 SE2d 38).

Furthermore: "There was no error in causing the verdict to be reformed or remodeled in the presence of the jury before they had retired from the box." *Herndon v. Sims,* 7 Ga. App. 675 (3) (67 SE 835); *Monroe v. Alden,* 61 Ga. App. 829 (1) (7 SE2d 424); *Denham v. Kirkpatrick,* 64 Ga. 71 (4); *Manry v. First Nat. Bank,* 195 Ga. 163 (7) (23 SE2d 662). The trial court acted properly in assisting the jury in placing the verdict in the correct format. *Morgan v. Coleman,* 139 Ga. 459, 460 (77 SE 579); *Paulk v. Speer,* 143 Ga. 621 (1) (85 SE 867); *Franklin v. Towe,* 233 Ga. 950 (2) (213 SE2d 892).

In addition, "if the form of the verdict was improper, it was incumbent upon [plaintiff] to make its objections as to irregularity of form at the time of its rendition or otherwise such technicality is waived. [Cit.] This is so because a verdict may be reformed or remodeled in the presence of the jury before they have retired from the box. [Cit.]" *West Ga. Pulpwood &c. Co. v. Stephens,* 128 Ga. App. 864, 870, supra.

4. We find no reversible error where the sister of the defendant inquired of a juror, during a recess, whether

she knew a named party and whether another person was in a nursing home. See *Daniel v. Frost,* 62 Ga. 697 (7). Innocent inquiry of a juror, by one not a party to a trial, regarding the health of a possible mutual friend, is not such misconduct of a juror as to require a new trial. See generally 66 CJS 161, New Trial, §§ 47-51.

5. We have carefully examined the remaining enumerations of error and find them to be without merit.

*Judgment affirmed. Smith and Birdsong, JJ., concur.*

Argued May 10, 1979 — Decided September 11, 1979.

*Edward W. Szczpanski,* for appellant.
*David L. Mincey, David L. Mincey, Jr.,* for appellee.

